CHARLIE THOMAS *v.* CHESAPEAKE & OHIO RAILWAY COMPANY A CORPORATION

(No. 7163)

Submitted November 11, 1931.    Decided December 8, 1931.

*Fitzpatrick, Brown & Davis* and *C. W. Strickling,* for plaintiff in error.

*A. A. Lilly,* for defendant in error.

MAXWELL, JUDGE:

This is a writ of error to a judgment of the circuit court of Fayette County based on a verdict of $6,500.00 in favor of the plaintiff who was employed by defendant in maintenance of way. The suit is under the Federal Employers Liability Act. The defense is assumption of risk.

Plaintiff was severely burned about the face, left eye, neck and left wrist while assisting in unloading a car of hot cinders on a branch of defendant's railroad in Fayette County. The car was an all steel gondola with two drop doors in the bottom. As was usual in unloading cinders for ballast, this car was placed by the men through the use of an engine at a point on the track designated by the section foreman. A crosstie was then placed immediately in front of the rear truck of the car, so that by pulling the car forward as the cinders would fall through the opening in the bottom of the car, the tie, sliding on top of the rails, would distribute the cinders uniformly. In this instance, after the crosstie had thus been placed, plaintiff and another employee climbed on top of the car to shovel the cinders downward when the opening should be made in the bottom of the car. One of the drops was opened. This was done by two men standing on the ground, one on each side of the car, striking the fastenings of the drop with sledge hammers. Plaintiff had reached the top of the car and was proceeding over the cinders to the opposite end, when, as he was near the middle of the car, the drop was suddenly released and he fell with the hot cinders to the track beneath, with resultant injuries.

The plaintiff knew that the cinders were hot, and he was familiar with the usual procedure in unloading cars of cinders; but, though he had worked on this section for about six months, it appears that he had not in that time assisted in unloading a car of hot cinders.

It is the contention of plaintiff that it was customary for a warning to be given to the men on top of a car of cinders when an opening was about to be made in the bottom of a car for the purpose of letting the cinders through, so that they could station themselves at places of safety, but that in this

instance no warning was given. He testified: "A. * * * I started across. I was looking for them to holler before they knocked the drop. * * * They hadn't got the hammers when I started up."

Defendant contends that it was not customary to give such warning; that plaintiff and his. co-employees had been instructed that when they went on top of a car for the purpose of assisting in the unloading of cinders, they should remain at the ends of the car in places of safety until a hole should appear in the cinders indicating that the drop had been opened. Plaintiff denies that he ever received such instruction. It is said that the pounding on the fastenings of the drop bottom of the car with eight pound hammers was begun just after the tie had been placed and immediately before plaintiff was injured, and continued quite audibly as he climbed on top of the car; hence he should have known the probable danger in then attempting to cross over the cinders to the opposite end. He says he did not hear any order given by the foreman for the fastenings to be knocked loose; that he did not hear any knocking on fastenings of the drop before the opening suddenly appeared under him. The foreman and other members of the force say the order to knock open the fastenings was given by the the foreman in a loud voice so that all could hear. Whether the command was given by the foremman and whether the plaintiff should have heard it and thereby have been put upon notice of the impending danger to a man on top of the cinders, were purely questions of fact for jury determination. It was also a jury question as to .whether an instruction had been given the plaintiff as to his duty when on top of a car of cinders about to be unloaded.

It being uncontroverted that the drop was opened by the use of sledge hammers, can it be said as a matter of law that plaintiff should have been warned thereby of the danger, considering that he was experienced in that sort of work? Probably so, if there was much pounding, but there may not have been very many licks struck. Plaintiff says that sometimes one lick will open a fastening; other witnesses say it takes more. This difference in testimony raises another jury

question. If only one or two licks were struck at each end of the drop door that was opened, the plaintiff, even though he had heard the licks from his position on top the cinders, would probably not have had sufficient time after hearing the licks to avoid the catastrophe which overtook him.

On the proposition that it was customary for warning to be given to the men on top of the car that the drops were about to be opened, the testimony of the plaintiff is contradicted unequivocally by the foreman and all of the other men except D. W. Lewis. On direct examination he, too, testified that it had not been customary for warning to be given when the drop door was about to be knocked open; but on cross-examination he made the unqualified statement: ''They always—there is always a warning given when they are going to knock the drops.'' Immediately succeeding that answer were the following questions and answers: ''Q. Always a warning given? A. Yes, sir, when they knock the drop. I always said that, because I have heard it. Q. Then you tell the jury that always heretofore when they were going to knock the dog or the latch, that they would give warning? That is right, isn't it? A. Indeed they always do give warning or holler when they are going to knock it, yes, sir. Q. And that had been the custom and practice all the time? A. Yes, sir. Q. And that is because men would be up on top and might be in danger, so they would be in a safe place. A. Yes, sir.'' Later he returned to the witness stand and, on redirect examination, testified that he had not meant to say on cross-examination that it was customary for warning to be given before a drop was knocked open; that he did not understand the import of the inquiry; that what he had intended to say was that it had been customary for a warning to be given before the car was moved after the drop had been opened, when the men were inside of the car shoveling. Here, again, was a matter for jury determination. They may very well have concluded that the answers of the witness on cross-examination (above quoted) were so clear, unequivocal and emphatic that he must be deemed to have known what he was talking about, and that his subsequent attempted repudiation of what he said on cross-examination was an effort

to overcome the damage which he thought he had done. Again, we emphasize, this was purely a jury matter.

The legal questions presented are not difficult. The rule obtains in this line of actions as in actions at law generally that issuable matters of fact are for jury determination. *Kanawha & M. Ry. Co.* v. *Kerse,* 239 U. S. 576; *Kirk* v. *Virginian Ry. Co.,* 105 W. Va. 335, 142 S. E. 434. It is for the jury to make deductions of fact from the evidence. *McGovern* v. *Phila & R. Ry. Co.,* 235 U. S. 389, 59 L. Ed. 283.

An employee assumes the ordinary risks of an occupation whether he actually knew of them or not, also such other risks that are so obvious as to preclude the inference that he was unaware of them. *Childress* v. *Ry. Co.,* 111 W. Va. 92, 160 S. E. 564; *McGraw* v. *Ry. Co.,* 111 W. Va. 175, 161 S. E. 9. But "while an employee assumes the risks and dangers ordinarily incident to the employment in which he voluntarily engages, so far as these are not attributable to the negligence of the employer or of those for whose conduct the emmployer is responsible, the employee has a right to assume that the employer has exercised proper care with respect to providing a reasonably safe place to work (and this includes care in establishing a reasonably safe system or method of work), and is not to be treated as assuming a risk that is attributable to the employer's negligence until he becomes aware of it, or it is so plainly observable that he must be presumed to have known of it. The employee is not obliged to exercise care to discover dangers not ordinarily incident to the employment, but which result from the emmployer's negligence." *C. & O. Ry. Co.* v. *Proffitt,* 241 U. S. 462, 60 L. Ed. 1102. The foreman was at the side of the car when he says he gave the order "knock the drops," and when the knocking was done. He could easily have seen the plaintiff's peril. To have done so the most that would have been required of him was to step back from the car a pace or two so as to bring within the line of his vision a man on top of the car. These facts, too, were proper for the jury to take into consideration. In such circumstances, the query may very properly have arisen with the jury as to whether the defendant should be relieved of liability even on the theory that it had

sustained its contention that there had been no custom to give warning to the men on top of the car that the drops were about to be opened.

Instructions submitted by the court to the jury at the instance of the defendant fully and correctly stated the law of assumption of risk, also that the plaintiff could in no event recover unless it was made to appear that his injury was the result of negligence on the part of the defendant or one or more of its employees. Only one instruction was given at the instance of the plaintiff. It follows: ''The court further instructs the jury that if it believes from the evidence that the plaintiff, Charlie Thomas, is entitled to recover from the defendant, The Chesapeake & Ohio Railway Company, then it should take into consideration his loss of time, if any, by reason of the injury shown by the evidence, and also the nature and extent of the injury sustained, and whether or not such injury is permanent, and the jury should further take into consideration the physical pain and mental anguish and suffering which the said plaintiff may reasonably be expected to sustain, and allow said plaintiff such damage as it believes him justly entitled to from all the evidence in the case, not exceeding the amount sued for in the declaration.'' This instruction is challenged because it authorized the jury to consider whether the plaintiff's injury was permanent, when, it is said on behalf of the defendant, there is no evidence of permanency. While certain medical testimony introduced by the defendant tended to prove that the plaintiff's injuries were temporary, there is testimony on behalf of the plaintiff that would warrant the jury in believing that the injuries ere more serious than as contended by the defendant. The trial occurred about ten months after the accident. The plaintiff then carried scars on his face and wrist, and he testified that because of the injury to his wrist (a second degree burn), he was still unable to use it in a normal manner. He and members of his family testified that since the injury he has been expectorating blood. This evidence was all competent and presented for jury determination the question of the temporary or permanent character of the

injuries. It is not perceivable that the instruction prejudiced the defendant.

It is said that the verdict is excessive and should be set aside on that basis. It need scarcely be repeated here that, there being no fixed rule for the measuring of damages, such matter must be left largely to the discretion of the trial jury and the amount so ascertained will not ordinarily be disturbed. The courts will not hesitate to set aside verdicts where there are indications that the result was influenced by bias, passion or prejudice. Otherwise, the courts are slow to interfere in such matters. *Webb* v. *Railway Co.,* 105 W. Va. 555; 144 S. E. 100; *Landau* v. *Farr,* 104 W. Va. 455, 140 S. E. 141.

Discerning no error in the record, we affirm the judgment.

*Affirmed.*